MONCURE, J.
The questions arising in this case are, first, Did the testator intend that not only the children of Nancy, but all her remoter descendants, born whilst their mothers continued in servitude, should serve until they became thirty-one years of age, and then be free? And if he did, secondly, Was such intention lawful? I will consider these questions in their order.
First, as to the intention of the testator:
It was decided in Maria v. Surbaugh, 2 Rand. 228, that where a female slave is entitled to freedom in futuro, her increase born while she continues in servitude are slaves. That decision has not been universally approved. But it has been recognized and confirmed in many subsequent cases. Isaac v. West’s ex’or, 6 Rand. 652; Erskine v. Henry, 9 Leigh 188; Crawford v. Moses, 10 Id. 277; Anderson’s ex’ors v. Anderson, 11 Id. 616; Henry v. Bradford, 1 Rob. R. 53; Eills v. Jenny, 2 Id. 597; Osborne v. Taylor’s adm’r, supra 117. The principle of that case may now therefore be regarded as the settled law of the land, except so far as “it has been changed or modified by the Code, which does not apply to this case.
The principle is founded on the rules and policy of the law, and not on the presumed intention of the testator, or other person from whom the right to future freedom is derived. When freedom in futuro is given to a female slave, the donor rareljr intends that her increase born in the mean time shall be slaves for life. He generally either intends that they shall follow the condition of their mother, not only in respect to present slavery, but also in respect to future freedom, and does not say so simply because he believes it will follow as a legal consequence of the emancipation of the mother; or he fails to say so merely because the idea does not occur to him. “I have no doubt (says Judge Green in Maria v. Surbaugh) but that if the idea had occurred to him, that she would probably have children before she attained her age of thirty-one, he would have expressly provided that they also should be free; which could have been effected by the addition of these words ‘and her increase. ’ His not having done so satisfies me entirely, that he never thought of or intended to make any provision for the children. And if so, it was a subject in relation to which he had no thought, or will, or intention; and is consequently to be disposed of according to the law of the land.” But whether the donor has no intention on the subject, or, having such intention, fails to express it, the subject must, in either case, be disposed of according to the law of the land.
The court, however, has given effect to this presumed intention wherever any words have been found in the deed or will which could faily be construed to express it. In Isaac v. West’s ex’or, 6 Rand. 652, the deed was construed as conferring on the slaves a present right to freedom, reserving to the grantor a right to their services during his life, as a condition of the “emancipation ; and it was, therefore, held that a child born of one of the emancipated females in the interval between the execution of the deed and the death of the grantor, was free from its birth. In Elder v. Elder’s ex’or, 4 Leigh 252; Erskine v. Henry, 9 Id. 188; Anderson’s ex’ors v. Anderson, 11 Id. 616; Lucy v. Cheminant’s adm’rs, 2 Gratt. 36; and Osborne v. Taylor’s adm’r, supra 117, the word “all,” and other words of like comprehensive import, used in a will in reference to slaves to whom freedom in futuro was given, were construed to embrace the increase of the females born between the death of the testator and the period when the slaves were to be free.
The change made in the Code, ch. 103, § 10, p. 458, was designed to effectuate in all cases this presumed intention to emancipate the future increase of a female slave to whom freedom in futuro is given. The provision is, that “the increase of any female so emancipated by deed or will hereafter made, born between the death of the testator or the record of the deed, and the time when her right to the enjoyment of her freedom arrives, shall also be free at that time, unless the deed or will otherwise provides.” This provision does not alter the condition or status of the mother before that time arrives: Until then she is still a slave. It only presumes in the absence of any intention appearing in the deed or will to the contrary, that the future increase of the female were intended to follow the condition of their mother, not only in regard to present service, but also in regard to future freedom. The owner may direct otherwise; may declare his intention that the future increase of the mother born while she continues to be a slave, shall be slaves for life; and such intention would not be repugnant to the grant of future freedom to the mother.
This case occurred before the Code, and must therefore be governed by the preexisting law. The testator “directed Nancy to be freed at the end of twenty years. The increase of Nancy born during that period, and their issue, are slaves for life, on the principle of the case of Maria v. Surbaugh, unless the testator has directed otherwise in his will. He has certainly directed otherwise in regard to the children of Nancy born during that pe *605 riod, and declared that they should serve until they should become of the age of thirty-one years, and no longer. If the testator had stopped at that point, still the case would have fallen within the principle of Maria v. Surbaugh, in regard to the more remote descendants of Haney. But it would have been difficult to have accounted for his intention, if it did exist, to emancipate Haney and her children, but not her more remote descendants. “He might have strong reasons (says Judge Brooke in Maria v. Surbaugh, 2 Rand. 228, 245), for liberating her when she should arrive at the age of thirty-one, which did not apply to her children born before that period.” But what conceivable reason could he have had for liberating her children born after his death and before she arrived at that age, which did not apply to her more remote descendants born during the temporary service of their mothers? If he intended to emancipate the former, he must have also intended to emancipate the latter. The idea that the females would probably have children before they attained the age of thirty-one years, certainly occurred to him ; for he expressly provided for that event in regard to Nancy. Did he make a similar provision in regard to her female descendants? I think he did. After providing that if any of the females (including Nancy) emancipated in futuro by the previous clause of his will, should have children while they continued in servitude, such children should serve until they become of the age of thirty-one years, and no longer; he added the words, “and so on, until they shall all *become free.” These words, I think, indicate, that the testator intended to emancipate the mothers and all their descendants, subjecting such of the latter as might be born while their mothers were slaves only to such a limited period of service as he supposed would fully compensate their temporary owners for the expense of raising them. He wished “all” to become free; thus using that comprehensive word which has been so often held to embrace future increase, and to take a case out of the operation of the principle of Maria v. Surbaugh. He had expressed his wish in regard to children, and declared how long they should serve, and when they should be free: and to avoid repetition in regard to each succession of remoter descendants, he used the general and relative words, “and so on,” that is, after the manner and rule prescribed in regard to children, “until they shall all,” that is, the females and their descendants, “become free.” This, I think, is the natural and rational construction of the words, and the only one which will give them effect. If they have not this meaning, they have none, and the will must be read and construed as if they were not in it; for if the testator only intended to apply the provision to children, his intention is fully and plainly expressed without those words. “The court is bound to give effect to every word of the will, without change or rejection, provided an effect can be given to it, not inconsistent with the general intent of the whole will taken together.” 1 Jarm. on Wills 411, note (1). I am therefore of opinion that the testator intended, and has expressed the intention, that not only the children of Nancy, but all her remoter descendants, born whilst their mothers continued in servitude, should serve until they become thirty-one years of age, and then be free; and the next question is,
Secondly, As to the legality of such intention?
Some judges have doubted whether the statute, 1 *Rev. Code of 1819, ch. 111, g 53, p. 433, giving owners of slaves a right to emancipate them, authorized the gift of freedom in futuro. But these judges have admitted that the statute has been long and uniformly construed to give such authority, and that the construction could only be changed by legislative power. Tucker, P., in Crawford v. Moses, 10 Heigh 279; Brooke, J., in Anderson’s ex’ors v. Anderson, 11 Heigh 624. The cases which recognize this construction are too numerous to be cited; and it is too well settled to require any citation of cases. Instead of being changed, it has been confirmed and adopted in the Code, ch. 103, § 10, p. 458, before referred to.
It may therefore be assumed that the statute authorized the gift of freedom in futuro: And the only question is, whether the authority was subject to any limitation as to the period when the gift was to take effect; and if it -was, whether this case falls within the limitation?
The statute itself was silent on the subject; and if there was a limitation, it resulted from the rule of law in regard to perpetuities. If that rule applies to this case, the plaintiff is not entitled to her freedom, the contingency on which her claim is founded being too remote. But does it apply to the case?
In Pleasants v. Pleasants, 2 Call 319, it was held that the rule does not apply to a case of emancipation, and that persons claiming freedom, under circumstances like those under which it is claimed in this case, were entitled thereto. That case was decided by a court of three judges, to wit, Pendleton, Carrington and Roane. Two only of the three concurred in the decision; and it is therefore not, in itself, a binding authority. Whether it ought to govern this case, must depend on the reason on which it "was founded, and the circumstances which attended and followed it. There is a manifest difference between *a gift of freedom and a gift of property. In some respects thej' are similar, but in most respects different. Many of our judges have admitted and commented upon this difference. Many of our decisions are founded upon it. Maria v. Surbaugh is founded upon it; for the plaintiff, in that case, would not have remained the slave of the testator if there had been a bequest of the mother in remainder, instead of a bequest to her of freedom in futuro. Parks *606 v. Hewlett, 9 Leigh 511, is founded upon it; for if the female slave in that ease had been given to another person instead of being emancipated, her issue born afterwards would have been liable for the debts of the donor, instead of being exempt from such liability. “Emancipation is not strictly a gift of property,” as was said by Tucker, P., in that case. It is a renunciation of the relation of master and slave, which the master is permitted by law to make. It is the conjoint act of the law and of the master, with which the slave has nothing to do. Whether his freedom be a boon or not, he cannot refuse it, if it be conferred upon him by his master in the mode prescribed by law. He is not required to give a refunding bond, as a legatee is; “and, in case of deficiency of assets, though the specific legatees may be compelled to abate propor-tionably, emancipated slaves would only be compelled to abate as between themselves. In other words, all other specific legacies must be swept before an emancipated slave can be subjected to the debts at all.” Tucker, P., in Nicholas v. Burruss, 4 Leigh 289, 296. See also Patty v. Colin, 1 Hen. & Munf. 519; and Jincey v. Winfield’s adm’r, 9 Gratt. 708. It does not follow, therefore, that the rule in question is applicable to a gift of freedom, because it is applicable to a gift of property. It is applicable to a gift of property, because it is against the policy of the law that property should be rendered perpetually ^'inalienable. It may not be applicable to a gift of freedom, which is a renunciation of property.
So much for the reason on which Pleas-ants v. Pleasants seems to be founded; and now in regard to the circumstances which attended and followed it. It was decided in 1800, not very long after the statute was passed making it lawful for masters to emancipate their slaves, and was decided by very eminent judges, who had the best opportunity of knowing the meaning and policy of the statute. Judge Roane, though he based his opinion in favor of the claim to freedom in that case on a different ground, and therefore forbore to express a definitive opinion in regard to the application of the rule in question to that case, yet seemed to think that it was not applicable to the case. “It is clear (he says) that neither the particular species of property now in question, nor the case of a remain-derman (if I may so express it) claiming his own liberty, were in the contemplation of the judges, who established the doctrine on this subject; which, therefore, may not apply. ’ ’ The case has never been overruled by any subsequent case; nor has any judge, so far as I have seen, ever questioned its correctness. On the contrary, Judge Stan-ard, in Crawford v. Moses, 10 Heigh 277, 284, while he forbore to express a definitive opinion on the question, because the decision of the case did not require it, yet said, ‘ ‘The inclination of my mind is against the application of that rule respecting the limitation of property,- to cases in which property is not fettered but renounced ; in which property is not granted, but extinguished.” Since the case of Pleasants v. Pleasants was decided, more than half a century has elapsed; during which there have been several general revisions of our laws, and two revisions of our state constitution. Yet the doctrine of that case remains untouched by legislation; while the doctrine of prospective emancipation has been expressly affirmed, *and the doctrine of Maria v. Surbaugh overruled or changed in favor of the claim to freedom. I am therefore of opinion that Pleasants v. Pleasants ought to govern this case.
It cannot be said that the testator intended to violate the law or its policy. He seems to have intended, bona fide, to avail himself of the power which the act of 1782 conferred upon him, to emancipate his slaves. When his will was made in 1796, and when, it was recorded in 1798, there was no law requiring emancipated slaves to leave the state. Such a law was not passed until 1806. What the law authorizes cannot be said to be against its policy. He intended to emancipate Nancy and her future increase, but the convenience of his family required that she should continue in service for twenty years after his death; and he therefore so directed. He would probably have directed that her increase should be free at the same time with her; but he wished to afford a just indemnity to his legatees for the expense of raising such of her children as might be born while she continued in service; and he therefore subjected such children, and their increase born under the like circumstances, to a limited period of service. Had he directed the mother and her increase to be free at the same time and at the end of twenty years, they would all have been entitled to remain in the state as free persons. By subjecting a portion of the increase to a term of service, he did not keep them in the state contrary to law, nor place them in a condition in which they would be more apt to injure the community than they would be in a condition of freedom. That intermediate condition between free persons of color and slaves, which, in the case of Wynn v. Carrell, 2 Gratt. 227, is said to be “a condition unknown to the laws and contrary to their policy,” refers to the condition of a person who at the same time is partly bond and partly *free; and not to the condition of a slave entitled to future freedom, who, until the right to freedom accrues, is, to all intents and purposes, a slave; insomuch that, if a female, her issue born before that event were, under the law which existed before the Code took effect, absolute slaves for life.
There is perhaps another ground upon which the plaintiff might be entitled to her freedom, even if not so entitled on the principle of the case of Pleasants v. Pleasants. The testator’s general or paramount intent seems to have been to emancipate the mother and her future increase. He had also a particular intent; to subject some of *607 the increase to a term of service,. as a merely incidental means of indemnity for their support. “It is definitively settled as a rule of law (says Lord Eldon in Jesson v. Wright, 2 Bligh’s Par. R. 1), that where there is a particular and general or paramount intent, the latter shall prevail, and courts are bound to give effect to the paramount intent.” The general or paramount intent in this case was lawful, and ought it seems, to prevail, notwithstanding the particular intent, in whole or in part, may be unlawful. That view would make the increase, as to whom the particular intent might be unlawful, free from their birth.
But both intents ought to prevail, if possible. The principle of Pleasants v. Pleasants will give effect to both, without violating the law or its policy, at least as it existed at the death of the testator; and I therefore rest my opinion on that principle.
I am for reversing the judgment of the Circuit court with costs, and giving judgment for the plaintiff.
DANIEL, J. This case turns on the construction of the 10th clause of the will of Joseph Pierce. In the first clause of the will he bequeaths a number of slaves, with the future increase of the females, to his daughter Mrs. Templeman. In the eighth he states that he had *set certain other of his slaves at liberty, and expresses the desire that they shall continue so. In the ninth he says, of certain others, that “they are to be at liberty at the expiration of five years’ and of others, that “they are to be freed at the time I shall mention;” and then proceeds to specify the different periods at which the several slaves last mentioned shall be set at liberty; and among them is a female slave Nancy, who is to be set at liberty at the end of twenty years.
The tenth clause then proceeds, “It is my further desire, that if any of the above named female negroes mentioned in this my last will, shall have children while they continue in servitude, it is my will that the children shall serve until they shall become of the age of thirty-one years, and no longer; and so on until they shall all become free.
Eanny Wood, the petitioner, is the child of Julianna, who was the child of Nancy mentioned in the ninth clause of the will. Julianna was born before her mother Nancy attained the age of twenty, and Eanny was born before her mother Julianna attained the age of thirty-one; and Fanny had attained the age of thirty-one before the institution of her suit.
In considering her claim to freedom, two enquiries at once present themselves.
1. Are the grand children or remote descendants of Nancy embraced by the provisions of the 10th clause of the will?
2. If not so, can Eanny assert a right to her freedom as the legal consequence of the status of her mother?
It will be more convenient to dispose of the last question first.
And in doing so, it is but proper to note that the language used with regard to the children is slightly variant from that used in regard to their mothers. *The slaves mentioned in the ninth clause are “to be freed,” “to be set at liberty,” at the periods therein prescribed; and by the tenth clause, if any of the females shall have children while “they continue in servitude,” the children “shall serve until they shall become of the age of thirty-one years, and no longer.” I think, however, that when we look at the whole scheme of the testator, as developed in these two clauses, it is apparent that it was the purpose of the testator to place the children exactly in the same condition until they attained the age of thirty-one years, with that prescribed for the mothers, until they attained the age of twenty years. What was that condition?
In the case of Pleasants v. Pleasants, 2 Call 319, Judge Roane construed such bequests as conferring a complete right to freedom, with a postponement as to the time of its enjoyment. Persons so situated were, he held, “in the case of persons bound to service for a term of years, who have a general right to freedom, but there is an exception out of it by contract or otherwise.” This view, however, did not prevail in the case of Pleasants v. Pleas-ants, and is condemned by repeated decisions of this court.
In Maria v. Surbaugh, 2 Rand. 228, the testator bequeathed Mary (the mother of Maria) to his son, with a declaration that she should be free as soon as she arrived at the age of thirty-one years, saying nothing as to the increase. Maria was born after the death of the testator and before her mother, attained the age of thirty-one years. The court there held that the idea that Mary was free from the death of the testator, and only held to service till she attained the age of thirty^one, was wholly inconsistent with the obvious intention of the testator. The will declared her to be free only when she should arrive at the age of thirty-one years; and until she attained that age she remained a slave. And the rule with respect to the increase is *thus briefly and clearly stated by Judge Brooke : “Their claim (he said) is to liberty and not to property. The rule partus sequitur ventrem is a rule of property not of liberty, applicable to questions of property decided by this court, and has no application to the question now to be decided. The rule that the children shall be bond or free, according to the condition of the mother, is a rule of a different character, and has received a different exposition. It imports the condition at the time of the birth, in exclusion of any future right to liberty. It does not include a remote event which may never happen, nor any right of which the mother is not in the enjoyment at the time of her birth.” And Maria was held by the whole court (consisting of Brooke, Green and Cabell) to be a slave.
The same construction has been given to. *608 like bequests, and the same rule applied to those claiming' freedom under them, in the cases of Crawford v. Moses, 10 Leigh 277; Henry v. Bradford, 1 Rob. R. 53; Ellis v. Jenny, 2 Rob. R. 517.
And I can see nothing in the case of Isaac v. West’s ex’or, 6 Rand. 652, at all at variance with these decisions. In that case, the deed in terms spoke of present manumission ; and its plain intent and effect were, as was said by Judge Green (the other members of the court concurring), to renounce all the right and title of the grantor as master from the moment of the execution of the deed, reserving a right to claim the personal services of the slaves to himself only, as a condition of the emancipation. If the condition to serve the grantor (the judge said) was against law as inconsistent with the right granted, it could not frustrate the grant. And as by the terms of the grant the mother was entitled to present freedom, her child born after the execution of the deed was necessarily free at the moment of its birth.
The bequest to Nancy and her children was, I think, ^plainly not a bequest of freedom, with a condition annexed of serving for certain terms of 37ears, but a bequest of freedom at the end and expiration of the periods specified in the will. The case then, therefore, so far as it depends on the solution of the enquiry which we have been considering, is ruled by Maria v. Surbaugh. Fanny being born before her. mother’s right to freedom- accrued, in other words, whilst her mother was a slave, is herself a slave, unless her right to freedom can be made to appear in the answers to be given to the first enquiry, and to such other questions as may necessarily arise out of its consideration.
The counsel for the appellee argues, that the words of the will may be fully satisfied by confining the bequest of freedom to the children of those mentioned in the. ninth clause. I do not think so. We cannot so restrict the operation of the will without violating one of the cardinal rules for the interpretation of such instruments, and treating, as idle, language adequate to the expression of k most important purpose. The addition of the words “and so on until they shall all become free,” was not essential to the completeness of the bequest in favor of the children. The intention in respect to them had already been plainly expressed: And the obvious design of the testator in the use of these additional words was to extend the bequest of freedom to the children of the children and their descendants to the remotest generation, all of whom are, in the same manner, with the children, to be free as they severally attain the age of thirty-one }7ears.
The case does therefore fairly present for our decision one of the questions involved in the case of Pleasants v. Pleasants, before cited, viz: Whether such a bequest falls within the influence of the rules relating to perpetuities, and restricting executory bequests to certain limits.
The clause of the will of John Pleas-ants, under *which the question in that case arose, was as follows: “My further desire is, respecting my poor slaves, all of them as I shall die possessed with, shall be free if they choose it, when they arrive to the age of thirty years, and the laws of the land will admit them to be set free without their being transported out of the country — I say all my slaves now born or hereafter to be born whilst their mothers are in the service of me or my heirs, to be free at the age of thirty years, as above mentioned, to be adjudged of by mjr trustees their age.” And the court decided, that so far as the freedom of the slaves was made to depend on the subsequent passage of a law authorizing their emancipation, it would be too rigid to apply to the case the rule respecting the limitation of the remainders of a chattel upon too remote a contingency with all its consequences; but that a reasonable principle ought to be adopted to suit its peculiar circumstances; and that such a limitation was good in the event of the passage of the law while the slaves remained in the possession of the family, without change by the intervention of creditors or purchasers. And therefore, as the law had passed, that all of the ne-groes who at the date of the decree were above the age of thirty years, were free; and that all who were then under the age of thirty, and who were born before their mothers had attained that age, and all their future descendants born before their mothers had attained the age of thirty, should be free when they severally arrived at thirty years of age.
It must be admitted that the precise- question under consideration was necessarily decided in the decree rendered in that case. The court, however, who rendered it was composed of but three members, and the decree was in fact the decree of but two of the number.
Judge Eoane was of opinion that even if the claim of the paupers to their freedom should be treated as *that of ordinary remaindermen claiming property in them, it could not be defeated on the ground of the remoteness of the event of the passage of the law on which it depended. After stating 'that the utmost limits allowed by law7 for the vesting of an executory bequest was, the term of a life or lives in being, and twenty-one years after, and admitting that it was a fixed canon of property which should not be lightly departed from, and that an executory bequest was only good when the event must happen, if at all, within the prescribed limits, as he proceeded to apply the rule to the case, and said “the ’passing of a law to authorize emancipation standing singly, is too remote, as it may not happen within a thousand years. But when the testator goes on further and means the benefit of it to persons in esse (for they are the objects of his bounty, and unless it happened within their lives, it might as well, as to them, not happen at all), this restrains the hap *609 pening of the contingency, and makes the executory devise good, at least as to all who are within the legal limits.”
Judge Pendleton, on the other hand, was of opinion that if the claim of the paupers was to be governed by the rules with respect to the limitation of chattel interests, it could not be sustained. “To consider (he said) this freedom in the light of a limitation of the remainder of a chattel upon a contingent event, it would seem to assimilate to the case of such remainder limited over upon a general dying without issue, and therefore void ; since the legislative permission might never be given; mightbe afforded one hundred years after; or at any earlier period. And the will in the other case is allowed to be the rule of judgment unaltered by the event, although the dying without issue shall happen in a reasonable time; all being involved in one fate.” He then proceeded to express the opinion that it would be too rigid to apply the rule to the *case without assigning any other reason than that it was one of a claim to freedom and not to property.
Judge Carrington, on this branch of the question, observed, “I think that these devises are sustainable and not liable to the rule respecting chattel interests, limited on more remot,e contingencies than the law allows. For the subjects of the devises are different; inasmuch as in the devise of chattel property only is concerned; but liberty is devised in this case. Both sacred rights indeed; but the rules of limitation not necessarily the same with regard ' to them.”
In regard to those not in esse at the time of the passage of the law, Judge Roane was of opinion that they were free from their birth, because descended from persons who became free on the passage of the law, and who were thereafter in the condition of apprentices or persons bound to a temporary service. This view of the subject, he said, dispensed with the necessity of his considering whether the doctrine of pre-petuities could apply to cases where human liberty is challenged. “It is clear (he proceeded to remark), that the restraints rightly imposed on the alienation of inheritances to prevent perpetuities are founded principally if not solely on considerations of public policy and convenience: That these restraints have gradually been extended to terms for years and chattel interests, and that the utmost tolerable limits in such cases have not been settled, till after much investigation and a considerable lapse of time. It is also clear that neither the particular species of property now in question, nor the case of a remainderman (if I may so express it) claiming his own liberty, were in the contemplation of the judges who established the doctrine on this subject; which therefore may not apply. But this is an extensive question, and if it were necessary to be now decided (but it is not), it would be proper to weigh the policy of authorizing or encouraging ^emancipation (a policy which has certainly received in many instances, and partly by the act of 1782, the countenance of the legislature, at least from the era of our independence, and which must always be dear to every friend of liberty and the human race), against those secondary considerations of public policy and convenience, which appear to have supported and established the doctrine of the law on the subject of perpetuities, as relative to ordinary kinds of property.” The two other judges held that the negroes in esse at the passage of the law became free only on attaining the age of thirty years, and that their children born before the last mentioned period, and their descendants born before their mothers arrived at the age of thirty years, would be free also on arriving at that age; but they assigned no reason for holding (as they necessarily did in their view of the case), that the doctrine in regard to perpetuities could not be applied to bequests of freedom, however remote.
From this exhibition of the opinions of the judges, it is manifest that the decision in Pleasants v. Pleasants is of no binding force in the adjudication of the question under consideration : And I know of no other case in this court, and of none in the courts of any other of the slave states, in which the precise question has been expressly decided. It is true that in the cases of Elder v. Elder’s ex’or, 4 Leigh 252; Erskine v. Henry, 9 Leigh 188, and Lucy v. Cheminant’s adm’r, 2 Gratt. 36, the increase of females entitled to freedom at the expiration of a number , of years, or on the termination of a particular state, born during the limited servitude of their mothers, succeeded in the assertion of their claim to freedom. But in each case the claim of the increase was sustained under 'the provisions of a will construed to embrace them; and in each case the time, at which their right to freedom under the will would accrue, was within the limits allowed to *executory bequests. In each case the bequest was such, that had it been a bequest over of-the increase as property, instead of a bequest of their freedom to themselves, it would have been good. These cases therefore do not rule the question before us.
In the case of Crawford v. Moses, before cited, the question seems to have been discussed at the bar; but the report does not furnish us with any note of the argument. The case was however decided on other grounds, and none of the judges, except Judge Stanard, gave or intimated any opinion on the question. Judge Stanard said, that the inclination of his mind was against the application of the rule respecting execu-tory bequests of property to cases in which property is not fettered but renounced; in which property is not granted but extinguished. But he further said, that he had formed no definitive opinion on the question.
In this state of things we are left free to consider the question untrammeled by any authoritative decision. And in doing so it *610 is obvious to remark that bequests of freedom do in some 'respects differ from bequests of property: For no man can enjoy or acquire a right of property in himself. But it does not thence necessarily follow, that in considering the legal effect of testamentary efforts to emancipate, we are to regard testators as freed from all the restraints that control the disposition by them of their slaves as property. In the exercise of the right, recognized or granted by the legislature, to free their slaves, the owners are not at liberty to disregard the rights of others or to violate well established rules of law. Their power over the subject of emancipation is not unlimited. Slaves are property: And we shall find numerous instances in which the courts have held that bequests to them of their freedom were not only subject to the laws which protect the rights of third parties, but also to those ^general principles of public policy regulating the transmission and acquisition of property.-
Thus, by the act of 1792, emancipated slaves are, by express provision, made subject to the debts of the owners, contracted before the emancipation is made. But in a case arising under the act of 1782, in which there is no such provision, this court held that such was the law, independent of legislative enactment. Woodley v. Abby, 5 Call 336, 342. Judge Roane said that at the time of the passage of the act of 1782, the owners of slaves, though entirely free from debt, were not permitted to emancipate them except in a particular mode, and for meritorious services. It was deemed even as between master and servant, and in relation to the safety and policy of the state, improper that this should be done. A degree of liberality (he proceeds) however, began to manifest in favor of human rights at this epoch, and the act of 1782, in which the former policy of this country was relaxed, was the result. The mischief complained of was that conscientious persons were not permitted, even as between master and servant, to emancipate their slaves; and the act ought to be taken as only commensurate with this evil. The boon (he further observes) was not easily and readily obtained: And it is certain that the extension of the request, to the disregard of the rights of creditors, would have endangered and rendered abortive the request altogether. The right to - emancipate (he concluded) must be subservient to the well acknowledged principles of law and justice, preferring the creditors to all voluntary donees.
But it is not in this class of cases onlj’-that the rules respecting bequests of property have been applied to testamentary emancipation. We shall find that the courts have applied them in cases very similar to the one in hand. Thus, in the case of Williams v. Ash, 1 How. Sup. Ct. R. 1, the testatrix by her will gave *certain slaves to her nephew, with a proviso that he should not carry them out of the state of Maryland, or sell them to any one; in either of which events, the negroes were to become free for life. The nephew sold one of the slaves, and the question was whether the slave was not thereupon entitled to his freedom? Chief Justice Taney, in delivering the opinion of the court, after stating that by the laws of Maryland, as they stood at the date of the will and at the time-of the death of the testatrix, any person might by deed or will declare his slave to be free after any given period of service, or at any particular age, or upon the performance of any condition, or the event of any contingency, proceeded- to observe, “The contingency upon which the petitioner was to become free must, by the terms of the will, have happened in the lifetime of G-. T. Greenfield; and if he had died without selling him or conveying him out of the state of Maryland, the petitioner would have continued a slave for life. The event, therefore, upon which he was to bte-come free, was not too remote. ’ ’
“It is said, however, that this was a restraint or alienation inconsistent with the right of property bequeathed by the will. But if, instead of giving freedom to the slave, he had been bequeathed to some third person, in the event of his being sold or removed out of the state by the first taker, it is evident, upon common law principles, that the limitation over would have been good. Now, a bequest of freedom to the slave stands upon the same principle with a bequest over to a third person.”
And in the case of Harris v. Clarissa, 6 Yerg. R. 227, the court, in rendering its opinion, stated, as an objection to a particular construction of the will contended for at the bar, that such a construction would result in a perpetuity of slaves for a term of years.
And in the case of Peggy v. Legg, 6 Munf. 229., the ^testator bequeathed his slaves (in the year 1790) severally to his children, with a proviso, “that none of them be sold out of the families to whom devised; if offered for sale by any of them out of the family of my wife, my daughter and sons, that they be immediatelj' liberated, and I do hereby desire they may be free to all intents and purposes.” A son of the testator, to whom a female slave was bequeathed, being in possession by virtue of the bequest, died intestate, and she came into the possession of a grand daughter, by whose husband a child of the said slave was sold to a stranger, to be carried out of the state. It was decided that said child was not entitled to her freedom. No reason was given by the court for its opinion; ’but in the argument of the case, the counsel for the pauper contended that the right to emancipate by will was given by act of assembly, and that the claim of the pauper was under a will emancipating on a condition which had actually happened; that a condition not to alienate except to particular persons was good; that the condition in the will, therefore, was not repugnant to the estate ; and that if it were, it would still be good, for that the law allowed the destruction of an estate in slaves. They *611 argued further to show that the contingency was not too remote; and they relied on Pleasants v. Pleasants to show that bequests of- freedom to slaves are not subject to the restrictions concerning bequests of chattels on remote contingencies. Yet the court unanimously affirmed the judgment of the court below, denying the claim.
If the opinion of Chief Justice Taney in the case of Williams v. Ash, just cited (in which the whole court concurred), be correct, it is obvious that the decision in Peggy v. Legg cannot be sustained except on grounds utterly at war with the main principle on which the case of Pleasants v. Pleasants rests. Por in that view this court must have rejected the claim of Peggy on *no other ground than that the contingency on which her freedom was made to depend was too remote.
I regard the case as a strong one in support of the proposition that the legislature did not mean to exempt bequests of freedom from the influence of the well settled and wholesome restraints imposed on bequests of property. And I cannot perceive the force of the arguments pleaded in behalf of such exemption.
The right to emancipate slaves is by the law conferred upon those upon whom only it could have been properly conferred, viz: upon their masters and owner?. The right in the owner, under the sanction of the law, to give freedom to his slave, springs out of his ownership and control over him as property. His right is to emancipate his slave. And in what legal sense can a bequest of freedom by a testator to a slave to be born centuries hence, be called a bequest of freedom to his slave? The control of the testator over his slave terminates at a period fixed by the law'. Is he not, to all intents and purposes, seeking to exercise that control when he undertakes to declare that the slave shall thenceforward be free? Bet it be that the emancipation of a slave is to be treated as a renunciation or destruction of property. Still, does not the renunciation of a right necessarily imply the existence of it in him who renounces? And who else, besides the owner, can lawfully undertake to destroy property or the rights of property?
A bequest of slaves and their increase to the child of the unborn child of a stranger would be void. But 'a bequest of freedom to the remotest descendants of slaves, it is said, violates no rule. The legatee, it is true, in the latter case, does not receive property. But is not the act of emancipation, so far as the testator is concerned, a granting away of property or of the rights of property? Indeed, so far as the testator is concerned, it is not only a granting away of his ^rights of property, but it is something more. The renunciation of his right is accompanied by a declaration, which has the effect to transmute the right of property formerly held by himself, into a right to personal freedom, to be thenceforward enjoyed by the slave. The act of emancipation, in fact, must, from its very nature (if justly made), proceed from one who not only owns the property in the slave, but who also, for the occasion,, represents the sovereignty of the state. For, as was very justly remarked by Cat-ron, J., in Fisher v. Dabbs, 6 Yerg. R. 125, ‘ ‘manumission is an act of sovereignty just as much as naturalizing the foreign subject. The highest act of sovereignty a government can perform is to adopt a new member, with all the privileges and duties of citizenship. To permit an individual to do this at pleasure, would be wholly inadmissible.” And in the case of Thrift v. Hannah, 2 Leigh 300, 319, Judge Brooke said, “that it was one of the highest acts of sovereignty to elevate a slave from his degraded state to the rank of a freeman. ’ ’
So far, I have been considering the case upon the supposition that the law allows' prospective emancipation. In the view, however, which I take of the provisions on the subject, I have not been able to bring my mind to the conclusion that prospective emancipation was in the mind of the legislature at all. I concur with Judge Brooke in' the opinion expressed in Thrift v. Hannah, and with Judge Tucker in the views presented by him in the case of Crawford v. Moses. The act of 1782 looks obviously to gifts of freedom in presentí, and makes no provision for the probat of deeds and wills conferring future freedom. It declares- it lawful for any person, by his last will, or by any other instrument in writing under his hand and seal, attested and proved -in the county or corporation court by two witnesses, or acknowledged by the party in the court *of the county where he resides, to emancipate his slaves, who shall thereupon be entirely and fully discharged from the performance of any contract entered into during servitude, -and enjoy as full freedom as if they had been particularly named and freed by this act. No language could well have been employed showing more plainly than the terms used, that the emancipation contemplated by the legislature was to be complete on the probat of the deed or will conferring freedom, and consequently that the legislature were providing only for the probat of such instruments as were designed to effect immediate manumission.
So again, the act provides that all slaves so emancipated, not being, in the judgment of the court, of sound mind and body, &c., are to be supported and maintained by the person so liberating them, or by his estate; and that in case of neglect to do so the sheriff of the county, by order of the court, is to distrain and sell so much of such person’s estate as shall be sufficient for the purpose. This provision also looks plainly to a state of things arising on an act of immediate manumission, and has no reference to gifts and bequests of freedom, to take effect at a remote period, when in the nature of things, there can be no estate of the grantor or testator in the control of the court.
So again, the clause requiring that the *612 person emancipating-, if by written instrument in his lifetime, or his executor, if by will, shall deliver to the slave a copy of the instrument of emancipation, attested by the clerk, who is to receive a fee for the same, to be paid by the person emancipating, looks obviously to immediate emancipation.
If the act of 1782 could be regarded as one proceeding from a legislature convinced of the evil of slavery, and providing for its gradual removal by encouraging voluntary emancipation by the owners of slaves, there would be strong motives and arguments *on which to rest that construction of the act which allows of future manumission and discards the restraints imposed on donations and bequests of property, to take effect on the happening of remote events. So to construe the act as to suppress the supposed mischief, and to advance the remedy, would then be the leading duty of the courts in administering the law. And such would seem to have been the views entertained by some, of the judges in the earlier cases'.
I cannot, however, perceive any thing in-the provisions, of the act justifying such views of its,origin or purpose: And when we look to its history, as given by Judge Roane in Woodley v. Abby, it is, I think, made-most apparent that it was passed not' to invite and encourage the liberation of slaves, but was granted as a reluctant concession to the conscientious scruples of the owners of'slaves who, by the existing laws, had no power to free them except for meritorious services. And without further specific reference to the history of our legislation, I think it may be safely affirmed, that there are few states which have more fully acknowledged the wisdom of restraining within reasonable limits prospective limitations of property, or shown a greater repugnance to every disposition of it, savoring of a perpetuity, than this; few which have shown a more lively sense of annoyance at the presence of its free negro population or a greater anxiety for its removal; and none in which the legislature have manifested a firmer or more consistent purpose to uphold and cherish the institution of slavery.
Entertaining these views, I cannot discover in the act of 1782 any warrant for supposing that it requires the courts to disregard well established general rules in order to give effect to «bequests of freedom that cannot be sustained without their violation.
Instances of prospective emancipation, as well by will as by deed, have however so frequently received *the sanction of this court, that it is now no longer in its power to retrace its steps. Still be-lievipg as I do that the doctrine had its origin (to use the language of Judge Brooke) “in the spirit of humanity, rather than in the spirit of the law,” I feel under no obligation to extend it to any class of cases in which it has not been already established by authoritative decisions.
The case of Pleasants v. Pleasants, is as yet the only case in which a bequest of freedom to take effect on an event or at a period more remote than that which a testator is permitted to extend his control over the slave as property has been sustained. The case is of no force as authority in this particular, and I have endeavored to show it is not a correct exposition of the law. I do not feel bound to follow it. It violates, as I conceive, a wise -and well established principle, and gives unlimited reach to a doctrine pregnant with mischief to the best interest of the state. The love of property, the sense of the duty to provide for the wants and comforts of their own families, and the liability to have their estates subjected to the maintenance and support of such freedom as are unable, from mental or bodily infirmity, to support themselves, might so far operate to restrain the owners of slaves in their use of a power to grant present freedom, as to render the power thus restricted productive of no serious evil.
In recognizing the doctrine of prospective emancipation, this court has, I think, already done much to weaken and impair the force of these restraints. Still, no binding precedent has as yet placed the power wholly beyond the reach of such influences. If, however, we recognize the claim now asserted, we free the exercise of the power from all restraint; we necessarily declare that no event is too remote, no period too distant, for the vesting of gifts and bequests of freedom. Under the law so construed, every owner of slaves *may first carve out of his estate in them and their increase an interest for the benefit of himself and his family, nearly equal in value to the absolute estate, and bequeath to the remote descendants of the slaves their freedom, to take effect at a period far beyond the limits to which his control over them as property can extend. Thus first reaping all the benefits which he or his family could by law derive from the slaves as property, and then, without any liability, visiting the commonwealth with all the evils which flow from their presence as freemen. Such a power is adequate to the defeat of the whole policy of the state in regard to its slave and free negro population ; and no act of the legislature ought to be taken to confer it, unless couched in terms necessitating such a construction. We cannot, in my opinion, sustain the claim of the petitioners, without recognizing the existence of such a power. I cannot consent to do so, and am for affirming the judgment.
ABBEN, P. I do not regard the case of Pleasants v. Pleasants as of itself a binding authority, it being the decision of a majority only of a bare court. The right to emancipate in futuro, one of the principles affirmed in that case, has been frequently recognized since; and though I think it was an erroneous construction of the statute, the legality of such prospective emancipation cannot be questioned at this *613 day. But I do not understand any of the subsequent cases as- having' affirmed the right of the master to attach a condition or quality to slaves so to be emancipated in futuro, which will follow their posterity through all succeeding generations. Regarding them as property merely, such a principle would violate the doctrines of the law against perpetuities. But looking at them as human beings, and the act as one by which they are to be elevated into the condition of free persons, I think *there is nothing in the statute which empowers the owner of slaves to create this new status, by which his slaves and their posterity through all time shall occupy this anomalous position of being slaves up to the prescribed age, and free persons thereafter.
Under the decisions of this court, the issue of the slaves prospectively emancipated by the will, born before the period of emancipation arrived, were born the slaves of his-estate, and if not emancipated, would have been slaves for life. The will shows that the testator so regarded them, and did not intend to leave them to pass to his dis-tributees as so much property undisposed of, or to bequeath them as property to others. On the contrary, I think the leading intent was to emancipate them as well as their parents, and that the words used do emancipate them. A condition and quality was annexed contrary to the principles of the law in regard to perpetuities, and against the policy of the law in reference to this portion of our population; creating a distinct class intermediate between slaves for life and free persons through all future time, which, it seems to me, nothing but an express act of the legislature could effect. The condition, I think, was void as against law, and inconsistent with the grant of freedom. I think, therefore, that all the descendants of the slaves born after the death of the testator, were either born free, or entitled to their freedom when their ancestors in existence when the will took effect became entitled to freedom. I incline to the opinion that such after born descendants were free at the time of their birth. In either event, the appellant was entitled to freedom, and I therefore concur in the reversal of the judgment.
LEE and SAMUELS, Js., concurred in the opinion of Moncure, J.
Judgment reversed.